2011 HTC Corporation against IPCOM. If the council coming in could give the council who are departing a moment to get their things together. Space is a good morning. Mr. Stockwell, when you're ready. Yes, your honor, good morning. I'm here. I think we're pretty specific in identifying the error that the district court made here. If you look at the district court's opinion at page 46, it's pretty clear that the foundation for the invalidity ruling was the claim construction that claims 1 and 18 recite an apparatus, a mobile station, that achieves a handover by performing six method steps and then the claim describes the apparatus as actually performing the method steps. That was the error in claim construction that led to the district court, in our view, misapplying the IPXL doctrine. Now, we talked in our brief about the claim language and the specification but I also want to point out and sort of start in reverse error on the intrinsic evidence and point to the prosecution history. If you look in the record at A188 and it's repeated at A224, A249, A250, when the examiner rejected the claims in light of the Muszynski reference, how did the examiner read these preamble limitations that we're fighting over? Well, the examiner read the preamble limitations as describing things that were happening in the network and base station elements and the MSC. For example, the examiner cites storing link data and what he does there is he parrots the claim language and he annotates it with citations to the Muszynski reference. So, you can look at the claim language storing link data, you go look at what the examiner cited with Muszynski 210 of figure 4. 210 of figure 4 is the digital memory in the base station and it goes on. Resources of the first base station, he's citing to the base station. When the link is to be handed over, initially maintaining, he cites the MSC, the mobile switching center, that's the network switch, control processor 110. Holding, he cites the MSC, the mobile switching center. So, the examiner, when he put the language on its face, described actions that were going to be occurring in the network in order to achieve the handover, not things that the mobile station would be doing, which is where we think the district court erred in the claim construction. And I think the language supports us on that. I mean, it says a mobile station for use with a network. It says the network's got a first base station and a second base station. That achieves a first base station to second base station by, and then it lists a number of actions. Now those actions, storing link data for a link in a first base station, nothing in there talks about the mobile station. So, we look at the claim language, look at the prosecution, what does the specification say? Well, the specification confirms this. Column 5, line 56 through 64 talks about how the base stations get some messages. It says BS1 stops transmitting. The data required for the link initially remains stored in BS1 and initially BS1 does not reassign the resources. The district court, though, did not limit the analysis to just that preamble language, did they? Absolutely, Your Honor. I mean, the analysis on the IPXL is basically on pages 46 and 40, 45 and 46 of the court's decision. A lot of the analysis is, a lot of the analysis is discussing your case law, microprocessor enhancement and IPXL. The key, the nub of the district court's analysis on claim construction is on page 46 and that's where the district court finds that claims 1 and 18 recite an apparatus, a mobile station that performs all these preamble steps. And actually, the district court doesn't really discuss the claim language, doesn't really explain the conclusion other than citing a application, applicant characterized the elements in the preamble as process limitations. That's the sole analysis of the conclusion that it's the mobile station that does everything in the preamble. And I'll address that, but again, if you look at the specification, column 7, lines 46 through 48, the base station holds the resources of the mobile station in reserve. Column 7, lines 9 through 11. However, in this case, BS1 starts a timer. These statements in the specification tie back to what is being described in the preamble when it talks about the mobile station for use with the network to achieve handover and then lists the operations that the network is going to be doing in describing the handover. The district court didn't discuss any of that. The district court appeared to simply assume that it's the mobile station that's doing these things. And one of the reasons I say assume that is because even HTC in their brief, and I have it in the record here, HTC A938. Now, this is what they argued to the district court. They argued the six steps. They characterized the preamble elements talking about what happens during handover as steps. We say they're functionalities, but they argued those six steps recited in Assertive Claims 1 and 8 for achieving a handover do not further limit the recited structure of the arrangement for reactivating means plus function element. Instead, the steps recite actions that the first base station undertakes. The issue as to what was doing the functionality listed in the preamble was not even in dispute before the district court. Both IPCOM and HTC agreed that was happening in the base station in the network. Mr. Sunkwell, even if you persuade us on the means plus function clause and support for that means plus function clause in structure in the specification. An aristocrat. Yes, let me address that. So, first off, I do think the courts, your and Judge Bryson's decision in Budd is instructive on this point. So, in Budd, you instructed district courts in considering sufficient structure for section 112, paragraph 6 cases. You said, a challenge to a claim containing a means plus function limitation is lacking structural support requires a finding by clear and convincing evidence that the specification lacks disclosure of structure sufficient to be understood by one skilled in the art as being adequate to perform the recited function. That was the test that you instructed district courts to apply. In this case, the district court applied that test and at A42, she agreed that a skilled person reading the specification, she says, one skilled in the art would immediately deduce that a processor with a transceiver was the structure indicated by the specification. So, that factual finding gets reviewed for a technology licensing corporation decision. Now, I have not seen HTC. I mean, obviously, it's the court's decision as to whether HTC shows clear error. I don't think they can do so. We cited to both the district court and this court Dr. Rose's, their expert's testimony on this, which appears in the record at A731 and 732. Question, let's break it down. Answer, it has to be able to talk to the network, so you've got to have a transceiver. Same question about a processor and the same answer. We also submitted at A699 or 697 through 705 the testimony of Dr. Mattacetti. He put together a declaration explaining that a skilled person would read the disclosure and immediately understand that what is going to be formulating the messages and performing the call flow algorithm for reactivating the link is a transceiver and it's going to be, is a processor and it's going to be sending it by transceiver. Now, that conflates enablement under 112.1 and support under 112.6. As we said, an aristocrat, although the examples given in the 102 patent might enable one of ordinary skill in the art to make and use the invention, they do not recite the particular structure that performs the function and to which the means plus function claim is necessarily limited. And your honor, this is where I would disagree with you. If you look at your BUD decision. So in that case, it was about a selector and the specification disclosed a commercially available selector and the court held on, based on the record, that that was sufficient for one of ordinary skill in the art. Both BUD and Intel. I mean, there's certain structure that, I mean, for example, in electrical circuit, you might have block diagram with amplifier connected to oscillator, et cetera, without a single transistor or diode or anything else. And that would be fine because everybody knows what that structure is. And one of ordinary seal in the art would immediately perceive what the structure is. This is a little different, is it not? I don't think so, your honor, because Dr. Mattesetti and Dr. Rose looked at the specification and said, look, this is talking, clearly there's disclosure of the mobile station. And they said, when you hear that, the skilled person knows there's a transceiver and there's a processor. They know that. That is part of the disclosure. And the specification does set forth things that those devices do. Correct. But it doesn't explain how those things are done or the structure that will accomplish it. In this case, I assume that structure would be some sort of an algorithm. Well, respectfully, your honor, I think I would rest it at this. Your case law does not require you to identify a particular microprocessor or a particular transceiver. What the case law requires you to find is that a skilled person reading the written structure. That was the record evidence in this case, just like in BUD, just like in Intel with the core logic where there was no computer disclosed, and just like Dozzle. That disclosure is at column six from lines 30 to 44. Your honor, respectfully, I don't have that in front of me, but I would, if you look at Dr. Mattesetti's declaration, he cites to the portions of the 830 patent in describing why that conveys to the skilled person the transceiver and processor. That's pages A699 through A702, your honor. Are you arguing that that algorithm or that what you described to be the algorithm, it was not directly addressed by the district court so that the arrangement for transmitting linked data claim is also covered by that same algorithm? I believe that's the case, but quite frankly, the reason we stipulated on claim 12 had to do with the argument about the lack of disclosure. I mean, our position is the argument about there is no algorithm was waived. I mean, the parties agreed on that in the briefing leading up to the claim construction, and the court said she only wanted to focus on the issues in dispute, and the only dispute was whether there was structure to implement the algorithm. Right, and I understand that, and we'll address the waiver issue, but that's still up to us whether or not there is waiver. So, assuming that there's no waiver, is that the only described algorithm, and one that you would agree applies to all the claims including claim 12? I have to say quite candidly, your honor, I don't have that in my head as to whether claim, the elements of claim 12 were somewhat different than the elements of claims 1 and 18. There is a claim construction chart identified in the table of contents of our appendix, and it may be there, and it would have been identified by reference to the figures and specification. Let me just go back to one point, because I want to focus a little bit more on the IPXL issue. Look, if the court agrees that there was... Let me go back. On your waiver issue, how do you address this court's decision in Harris? I believe in Harris, there was a JMOL motion made after trial, and the court found that the JMOL motion was sufficient to preserve the issue, and this is in a different procedural posture, where the court has not... There has not been a full trial on the merits. There has not been a record developed on this. The district court did not consider this in the first instance, so I think if you find there is no waiver of the argument that there's no algorithm at all here, you're going to have to remand to the district court and let the district court address that in the first instance, rather than doing it yourselves, because the parties, quite frankly, in fairness, we didn't have a chance to address that. It was not disputed, so it ought to be remanded and allow the parties in the district court to address it. Just briefly on the IPXL issue, the FISERV decision just confirmed, just June 2nd, confirmed that there's nothing wrong with preambles setting forth environmental elements and proving infringement by reference to the IPXL. The environment and what the claim invention requires, that's the structure here. The claim elements, the preamble within the preamble structure here is very close to the microprocessor enhancement case. I understand the court distinguished microprocessor enhancement in the CATS case, but there the claim element in CATS was strikingly similar to what was at issue in IPXL. Here, the structure of this claim is almost the same as in microprocessor enhancement. The only distinction is microprocessor enhancement focused on the method claim, but there was also a Claim 7 in that case, with respect to which the court said, Claim 7 is clearly limited to a pipeline processor possessing the required structure and capable of performing the recited function and is thus not indefinite under IPXL. Here's some of the language in Claim 7 that was said to be simply describing capability. The pipeline stage performing a Boolean algebraic evaluation. Said enable write when true enabling and when false disabling. The pipeline stage when specified by the conditional execution specifier determining the enable write. I think the issue here is one of whether there was sufficient description in the preamble of the environment. That was done. There is no IPXL issue here. We do not have an actor that the claim specifically requires to perform something. I'm sorry. Aren't we just talking about grammar here when you're trying to see who's performing the actions in that preamble? Aren't there just some grammatical principles that you can apply to decide whether or not the steps are tied to the mobile station versus tied to the network? I'm not familiar with exactly what the court is asking. I do believe that just reading the structure of the claim, you can see that the reference to that achieves handover is talking about the network rather than the mobile station and that's certainly supported by the specification. Whatever the grammatical construction is. I see I'm in a microphone. You've run through your rebuttal time. We will reserve a couple of minutes for rebuttal. Mr. O'Bloin. Thank you, Your Honor. Good morning, Your Honors. My name is Michael O'Bloin. I'm here on behalf of HTC. Your Honors, there's two distinct issues on appeal, but the two distinct issues really fold down into one issue. That is that how can you provide an apparatus claim when there's no disclosure of any structure for that apparatus anywhere in the specification? That is important for both issues on the appeal, both the hybrid claiming issue and also, of course, the means plus function issue. What happened here was that the patent attorney who filed this patent application was faced with a conundrum. He wanted to try to claim the apparatus to avoid the divided infringement problem that would be associated with a method and that's all that was disclosed in this patent application was a method of just bouncing back and forth between three distinct entities. There's no disclosure of what those entities are, just that they exist. Here's a mobile station. Here's a first base station. Here's a second base station. He couldn't take any of them and actually go into the component level for any of them. He did this hybrid format. I'll start with the method that was described in figures two through six of this patent and then I'll put in this arrangement. When you look at this claim, claims one and 18 in particular, it's striking. There's something that just goes awry. Typically, it's common to see something like a mobile station for use with something, a mobile station for performing something, but here it's not about this kind of actionable language. It's an action. It says a mobile station that achieves. Now, there's an issue as to whether what is doing the achieving. Is it the mobile station? Is it the network? Let me go to my last point with your opponent and that is from a pure grammatical standpoint, I mean, it's a basic rule of grammar that a modifier modifies the nearest antecedent. There's no commas in here. Why should we assume that this sentence is a mobile station that achieves? Well, first of all, the nearest thing that it could be modifying would be the second base station and that couldn't be right because the second base station couldn't possibly be achieving these steps. In order to answer that question, you have to go into the specification and see what the real purpose of the invention was. Throughout the specification, it says over and over again that the mobile station achieves the handover. At AE 114, at column 2, lines 19 through 23, the situation may arise that the mobile station tries to perform a handover. Not that the network is performing the handover, but the mobile station tries to perform the handover. AE 114, 2, at lines 28 to 31, until now, this was only possible if one accepted the fact that the mobile station that was to perform a handover would not find the new base station. Again, it's actions of the mobile station. This continues on and on and we go through the list on page 22 of the red brief. The issue here is that the mobile station is the quarterback. That's the invention here, that the mobile station is able, instead of having a typical system, the way that a typical cell phone network works is that the network makes all the determinations. The network tells the mobile stations on the network what to do. But here, it's the mobile station who decides, you know what, I don't have as good a signal with base station 1 as I'd like to. I'm going to tell him that I'm leaving and I'm going to try to go somewhere else and see if I can attach there. And if I can't, then I'm going to find my way back. Now, the issue is... But the mobile station is either, depending on what claims you're looking at, reactivating the link or transmitting the link data. I mean, that's what the purpose of the mobile station is, correct? The mobile station is either reactivating the link or transmitting the link data. In addition to that, it's setting the entire process in motion. So, in other words, what it says in the patent is that this is a technique for forward handover. And in a forward handover, which is not described that anyone else was able to do this before, but in a forward handover, the mobile station tells the first base station, I'm leaving you and I'm going to look somewhere else. And I tell you that so that in response, you will stop sending me data and you'll hold my resources for me. And so, the issue as to who performs the steps, it really boils down to who's controlling this. And it's the mobile station that's controlling this. But the problem that we have here is that the mobile station is both required to perform actions and it's also the structure. And that presents the inherent confusion. It's worded differently than in the CATS case and the IPXL case. This is in the preamble. Those are in the body of the claim. But the import is the same. Because what's happening here is, how can we tell what... Is HTC infringing this patent when it makes or sells its product? Well, it depends on some of these steps that are being performed in this claim. And the last step that's performed is particularly instructive here, because that one is about deleting the link data. And it's disclosed or it's recited two different ways. In claim one, the link data is deleted when a timer goes off. And in claim 18, the link data is deleted when the base station, the second base station, sends a message saying, okay, hand over work. You don't need to hold this anymore. It doesn't need to be held anymore. And from HTC's perspective, neither of those has anything to do with what HTC is going to be doing. Those are steps that have to be performed and we're not talking about mere functionality. So how can we fix this claim? See, the issue here is, there's two issues. They fall down into one central problem, but one of them would have been fixable and the other one would not. The method part could have been fixable. They could have added structured to, capable of, adapted for. Those are the kind of words that you typically see in ordinary patent parlance to talk about capability and functionality. But here they use the active tense. They said, and that's why grammar is important. They said the mobile station for use with a network, having first and second, that achieves handover. And that part now puts it straight into the wording of IPXL. It's no different from saying- But it says that achieves handover by doing certain things. That's right. That can be interpreted to mean a capability. It's a network that achieves certain things by doing certain things when it achieves it, on what conditions, at what time, in response to what stimulus is a separate issue. Well, there's, see, in a, Pozen Council cites to the MEC case, and that one it was about in a pipeline processor and it was a method claim. And in a method claim, it's appropriate to recite in the preamble an environment in which the method is to operate. It's very simple steps. And we want to know when and where those steps are going to occur. So we provide the environment. In an apparatus claim, it doesn't work quite that well. It works fine if the environment is a structure. And you see that all the time. And in every single example, the BICON case, the GE case, every case that's cited in their brief, the environment is structural. It's something that, or it's just intended use. But here, what we're seeing is it's not just a method claim. There are steps. Those by doing this, doing that, doing that, those are steps. And when you look at the appendix, and you look at the file history in this case, when the application was first filed, they went for the method. In fact, if I can direct your attention to page A343 of the appendix, that shows on the date that it was filed, what these claims looked like. And claim one says a method for handing over a link. And then it lists four or five steps. And those steps are the exact same steps that appear in claim five now, written in the same way. And then we go through the file history, and we see how those steps are treated. And we don't just have to look at what the district court said, their steps. We have both the examiner and the patent attorney. The examiner, throughout the prosecution, referred to them as steps. And he tried to distinguish it by, or I'm sorry, he objected, he rejected the claims based upon prior art and the methods that were shown and disclosed in the prior art. The next page in the citation that Post and Counsel had provided, first he disclosed in the examiner's rejection, he points to structure in the base station of the prior art reference, the Mazinski reference, to show these are things that can perform steps. But then in the next page it says, however, Mazinski shows this method. He refers to it as a method. He refers to it as steps. And the patent attorney adopts it and says the same thing throughout the prosecution history. The Jayapalan reference, he continues on, discloses this method, if I turn your attention to A138. There's nothing wrong inherently with beginning with the prosecution history that contemplates both method and apparatus claims and then backing out and deciding not to proceed with the method claims, is there? No, no, absolutely not. What happened was they started with claim one as a method claim and claim five was this kind of hybrid format. And then they abandoned claim one and just went with claim five, which is now claim one. So claim five during prosecution is now claim one in the issued patent. And so in the prosecution history, when the examiner is referring to the fact, I'll just quote page A38, Jayapalan describes a method in which the loss of data and this and this happens. I'm sorry, that's not the examiner, that's the applicant. This is 138? Correct, Your Honor. At A138, it's the applicant who's saying Jayapalan discloses a method. And then on A139, he says, in contrast, the applicant's invention does this instead. And so he is distinguishing the prior art based upon the method disclosed in the prior art. And this is, Judge O'Malley, just to be clear, I'm sorry, I didn't want to create confusion there. This office action response is directed to claim five, which you see at A40. It says, withdraw the obviousness rejection of claims five and 23. And five was issued as claim one. So that's how we get there. I see that I'm losing some time and I want to turn to the other issue, which I think is fundamentally important. Because again, this first issue about the hybrid claiming could have been fixed if they would have used language about adapted for, configured, et cetera. The second issue is much more severe because it gets to that quid pro quo, the bargain that you're supposed to strike in order to have a means plus function element. The Budd case that opposing counsel referred to isn't dictating that in this case there's adequate disclosure. In the Budd case, the court expressly held or stated, and of course I'm not going to find it. The court stated, this is in the Budd case. This problem is preferably solved without making impractical and undesired mechanical modifications to the engine. The whole purpose of that was a motorcycle engine. That's right. It has off the shelf parts. Correct. And it was a sensor and it wasn't that big a deal. Now, let's turn to this issue about what the experts agreed to. Everyone in this room, and I think everyone over nine years old, knows that a cell phone has a processor in it and it's got an antenna. And so when Professor Christopher Rose admitted, well, of course, you got to have a processor to crunch the data and you've got to have a transceiver to send things in and out. He wasn't admitting that that was tied to the function in the means plus function limitation. That's the operative issue that has to be addressed. He's just saying, of course, phones have a processor and phones have a transceiver. Here, the claim is unlike the DOSL case, for example, this claim is not directed to one single element. Sure, it says that it comes in, it says that there's number crunching, it says something gets spit out. It just didn't say the word computer, but we all knew it was a computer. That's what was happening in the DOSL case. Here, it's an arrangement. We know it has to be more than one thing. And that puts us more into the zone of the Biomendino case than the DOSL case. And yet this is worse than that one. In the Biomendino case, it had to do with the control means. And in the specification, the patentee said, this can be done by a known arrangement of control valves and pipes and things like that. So you're still focusing then on the hardware structure? Yes, Your Honor. And I will address the issue about the waiver. Thank you for reminding me of that. Let's move to the algorithm issue. You belatedly argue that even if the hardware structure was known to one of skill and the art, that the algorithm doesn't sufficiently disclose any structure. How do you get there when you not only didn't raise it during claim construction, but you didn't even raise it during your summary judgment motion? We did raise it in the summary judgment motion. It was raised by saying that the two have to be tied together. The issue is not just whether there's an algorithm, but whether it's known what it's going to be performed on. And here, there was a brief sentence in the summary judgment where, or in a separate section of your brief where you're talking about the 112 arrangement for transmitting link data where you said there's no program. But as it relates to the claims 1 and 18, you never focused on this issue. What it says is, and I don't have the site in front of me, but I will find it while I'm sitting if that's okay. In our summary judgment brief, we stated that at best, all they showed was system-wide capabilities and a system-wide type algorithm, not the algorithm that would actually be occurring on the phone. And the issue here, and I know I only have a few seconds left, and the point that I want to conclude with. We'll give you a little bit of extra time. We gave the other side some extra time. Thank you, Your Honor. The issue is here, if it just said a computer, or if it didn't say a computer, but everyone knew it's just a computer, like in the Aristocat case or something like that where, okay, at least we know it's just supposed to be a computer, and now we're trying to figure out whether the algorithm is sufficient. This is far worse, because here, we've got a processor and a transceiver. We don't know that. We don't know that. In fact, when you look at, if I turn your attention to the appendix at A697, 696 and 697, this is an excerpt from the expert report from IPCOM. This is my adversary's expert report, and what he's doing is he's providing figures from various patents that were around at around that time to say, look, everybody knew that at the time there was a processor and there was a transceiver in a phone. We don't disagree with that, but look at what else you see here. You see controllers. You see on page 697 at figure one at the top, there's a separate transceiver and a separate alternate transceiver. You look at the bottom, figure three. You see a store time slot code, a frequency synthesizer. Why is it that they're different? If everyone knows that it's going to work this way and it's going to have this functionality, why would there be differences? It matters here because in the patent, it says in the summary of the invention, in contrast with the known phones, the known base stations and the known networks, here we provide something new. We asked that same question of the inventor in his deposition and said, what do you mean by that? He said, the known phones aren't going to work. You're going to need to devise something new. But the district court made a factual finding that one of skill in the art at the time would understand what this hardware structure was. The district court was applying the wrong legal standard. The issue that the district court was addressing was that, and misinterpreting what Professor Christopher Rose had said. Christopher Rose never said that one of ordinary skill in the art would understand that a processor and a transceiver would be the necessary structure to perform the recited functionality in the means plus function claim. What he said was, everybody knows that a phone is going to have a processor and a transceiver, but we don't know what structure is going to perform the recited limitations. It's what you're saying that a transceiver and computer, a transceiver and processor are necessary but not sufficient to perform this function. Everybody agrees that they're necessary. Not exactly. What I'm saying is that a transceiver, and if you're trying to help me, I don't want to go the other way, but what I want to, let me explain. I'm trying to translate it into terms that I will understand, so dumb it down a little for me. If we turn to A697, in this example, we see two transceivers, a first one and a second one. If we turn to the next page, at A698, we see one transmitter and one receiver, so they're separating the transmitter and the receiver from each other. They're not grouped together, they're separate. I don't know whether, and one of order skill in the art who would read this wouldn't know what the right functionality is for performing this. We know that phones have processors. We know that phones have transceivers. Whether you're going to need a separate transmitter and a separate receiver to accomplish this, we don't know. Whether you're going to need a separate digital signaling processor to do this functionality, we don't know. There's no disclosure here whatsoever, and that's what differentiates this from the Bud case, from the Ursica case. What if we conclude that there's enough physical structure, then what? If you conclude that there's enough physical structure, then you have to look at, the problem is there's nothing disclosed at all, so how can one conclude that by merely identifying that there is a mobile station, that that connotes any structural components at all? I just said, assume that we do, then what? Then if you assume that you do, then the next step is to figure out, do we know necessarily which aspects of those structure perform the aspects of the recited functionality? You can't get there either, because you don't know whether the transceiver is the thing that brings in the signal, and that the processor will then do the re-synchronizing, or maybe the re-synchronizing will be done in the transceiver. There's multiple components, and so even if one would conclude that we know what those components are, without any disclosure of those components, and without any disclosure as to how those components perform the functionality, you're left with the same problem. Very well. Thank you, Mr. O'Brien. Mr. Stockwell? Just briefly, Your Honor. Two minutes. Okay. So, at A619, this is why the algorithm issue was not raised. This is their brief. They say, additionally, and we're talking about this element, additionally, if a failure occurs during the course of a handover, the algorithm provides capability for a mobile phone to return to the original base station. And then at A864, they have a section saying, our proposed construction, this is section D of their brief, for the arrangement for limitations, failed to incorporate critical steps. And in that, they identify in the middle paragraph on A864, what they contended to be the algorithm. Now, by the time we got to the hearing, we had pointed out to the district court, Your Honor, we agree, this is the algorithm. And the court had ordered the counsel to restrict the terms, as is reflected in the record, to only those in dispute. The only thing that was in dispute, by the time we get to the hearing, was the hardware issue. With respect to which, counsel has conceded that mobile station is known to the people of skill and the art to include the transceiver and the processor. And the argument they made below, which they didn't really make in their briefs, but now I see reprising here, is that it's not specific enough as to the transceiver or the microprocessor. The Intel case specifically addresses that, and it cites a number of other cases that address that, as does the Bud case. Finally, with respect to the IPXL issue, I think that achieves by, is no different, a signal indicating capability than adapted to, or structured to, adapted for, or capable of. It's the same signal indicating this is capability that you typically see. Just like the that refers back to the network. Now it is broken up by the network, including base station one and base station two. But the that refers to the network that precedes the including clause, which indicates why the court misconstrued that element. Thank you. Thank you. Your Honor, if I could just have one moment, because I found that site that I was missing. Well, give us the citation, but without argument, please. Thank you, Your Honor. Just to go up to the microphone, the site is at A628. A628, that's correct. And it's at footnote three. Okay, A628, thank you. The case is submitted.